Dickenson v. Breeden.

---

HENRY R. DICKENSON, Appellant, *v.* JAMES W. BREEDEN, Appellee.

APPEAL FROM HANCOCK.

The court will take judicial notice of the acts of Congress, for the survey of lands in this State; also, of the dedication of a portion, for bounties to soldiers of the war of 1812 ; also, of the subdivision of the State into counties. Hence a description of land, designating it as "a tract situated, etc., in the county of Hancock, in the State of Illinois, containing one hundred and sixty acres, be the same more or less, being north-west 26, north 5, west 8, of the bounty lands, and being the same quarter section, patented by the United States to Edward Crow, a soldier in the late war," is a tract in Township 5 north, Range 8 west of the fourth principal meridian, and if there were any ambiguity in the above description, resort might be had to the patent to Crow, and to the deeds from him and his grantee.

Where a purchaser of land has actual notice that the property has been previously sold to a different person, the deed to the latter, though last on record, will take precedence of the deed to the former.

Any deed purporting on its face to convey title, no matter on what it may be founded, is "color of title."

Dickenson *v.* Breeden.

The deed, itself, purports "good faith," unless facts and circumstances attending its execution, show that the party accepting it had no faith or confidence in it.

The rule, in relation to notice of title in another party, or notice sufficient to put a purchaser on inquiry, has no application to a claim arising, under the statute, from the payment of taxes, under claim and color of title.

The payment of taxes in February, 1848, for the taxes of 1846 and 1847, and thence continuing yearly till a payment in April, 1854, for the tax of 1853, is not sufficient to create a bar under the ninth section of the statute entitled Conveyances.

The payment of taxes for seven years must be complete under either the eighth section alone, or under the ninth section of the statute of conveyances, in order to establish a bar. The two sections cannot be blended.

*Dawley* v. *VanCourt, supra,* considered and modified.

THIS was an action of ejectment, instituted in the Circuit Court of Hancock county, 1859, to recover the north-west quarter of Section 26, Township 5 north, Range 8 west, of the fourth principal meridian.

On the trial the parties waived a jury, and submitted the case to the court, and thereupon the defendant admitted that he was in possession of the premises in controversy, at the time of the commencement of this suit, March 7, 1859.

To sustain the issue on his part, the plaintiff then read in evidence the following patent and deeds, to wit:

A patent from United States to Edward Crow, dated 5th November, 1818, for premises in question, and in due form.

Also, deed from Edward Crow to Benjamin Hughes, for same premises, dated December 18, 1818, and recorded October 6, 1859, and in due form.

Also, deed from Benjamin Hughes to James I. Dozier, for same premises, dated November 15, 1822, and recorded October 6, 1859.

Also, a deed from James I. Dozier to Elisha L. Conant, dated October 8, 1835, and recorded September 10, 1836, in office of recorder of deeds of Hancock county, Illinois, in Book B of Deeds, page 464, as follows, to wit:

"This Indenture of Bargain and Sale, Made and entered this 8th day of October, 1835, between James I. Dozier and E. L. Conant, both of the city of Louisville, State of Ken-

tucky, witnesseth : that the said Dozier hath this day, for and in consideration of the sum of one hundred dollars, to him in hand paid by the said Conant, granted, bargained and sold, aliened and confirmed, and by these presents doth grant, bargain, sell, alien, convey and confirm, unto the said Conant and his heirs, a certain tract or parcel of land, situate, lying and being in the county of Hancock, in the State of Illinois, containing one hundred and sixty acres, be the same more or less, being north-west 26, north 5, west 8, of the bounty lands, and being the same quarter section patented by the United States to Edward Crow, a soldier in the late war, who deeded the same to the said Dozier, to have and to hold the said tract of land, together with all the privileges, immunities, the rights and appurtenances thereunto belonging, to the said Conant and his heirs forever. And the said James I. Dozier, for himself and his heirs, doth covenant with the said Conant and his heirs, that he will, and his heirs shall, warrant to the said Conant and his heirs, and forever defend to him and them, the title to the said before described tract of land, to his and their only proper use, benefit and behoof, against the claims of all and every person or persons claiming or to claim the same. In witness whereof, the said James I. Dozier hath hereunto set his hand and affixed his seal the day and year hereinbefore written.

JAMES I. DOZIER. [L. s.] "

Also, deed from Elisha L. Conant to James W. Breeden for same premises, dated January 2, 1858, and recorded May 14, 1858, and in due form; which was all the evidence in chief on the part of plaintiff.

To sustain issues on part of defense, defendant introduced in evidence the following—(to the legal effect of all which said evidence the plaintiff objected):

1. A deed from Samuel Crow, Elizabeth Crow, Mary Louisa Griffith, and John Griffith, to Bryant Bartlett and Henry R. Dickenson, for the said land in question, dated May 13, 1854, and recorded June 10, 1854, executed and acknowledged on said May 13, 1854, in the county of Jefferson, and State of Kentucky.

19

2. Also, a deed from Bryant Bartlett to Henry R. Dickenson, for the premises in question, dated February 1, 1856, and recorded August 12, 1856.

3. Defendant also proved that said Edward Crow died in the year 1832, and that the above named Samuel Crow and Mary Louisa Griffith were his legitimate and only children and heirs-at-law, and that the said Mary Louisa had intermarried with the said John Griffith prior to the 13th May, 1854.

4. Also, a deed from Stephen B. Munn to Charles F. Moulton and Russel H. Nevins, for the premises in question, dated December 7, 1835.

5. Also, a deed from Charles F. Moulton and Russel H. Nevins, to Robert Schuyler, Russel H. Nevins, William Couch, Abijah Fisher, and David Lee, for said land, dated 1st March, 1836, as joint tenants, and not as tenants in common.

6. Also, a deed from Robert Schuyler, William Couch, and Abijah Fisher, to William Couch, Abijah Fisher and David H. Nevins, for said land, dated September 20, 1854.

7. Also proved by Charles A. Savage, that the said Russel H. Nevins, and David Lee died, the latter named in January, 1853, and the former in October or November, 1853.

8. Also, a deed from William Couch, Abijah Fisher, and David H. Nevins, to Abijah Fisher, David H. Nevins and Nathan T. Carryl, for said land, dated October 4, 1854.

9. Also, a deed from Abijah Fisher, David H. Nevins, and Nathan T. Carryl, to Henry R. Dickenson, for said land, dated September 26, 1856.

10. Also, a bond for a deed of said premises, from William Couch, Abijah Fisher, and Robert Schuyler, to Bryant T. Scofield, dated April, 1854.

11. Also, an assignment of said bond, by said Scofield, to Bryant Bartlett and Henry R. Dickenson, dated June 1, 1854.

12. It was admitted that said Bartlett and Dickenson took possession of the said premises in June, 1854, and that the defendant has been in possession thereof ever since; and that before that time the said premises had always been vacant.

13. Also, receipts for taxes of 1846 and 1847, on the premises, paid by Robert Schuyler, William Couch, Abijah Fisher,

Russel H. Nevins. and David Lee, both dated February 4, 1848.   Also, receipts for the taxes of 1848, 1849, 1850, 1851, 1852 and 1853, paid by the same parties, the last receipt dated April 24, 1854, on the same premises.

14.   Also, receipts for tax on same premises for 1854, dated on the 8th of February, and for 1855, dated on the 5th December, 1855, paid by said Bartlett and Dickenson.

15.   Also, receipts for the taxes of said land, for the year 1856, dated December 22, 1856, and for 1857, dated 29th January, 1858, paid by the said Henry R. Dickenson.   ·

Declaration was served 7th of March, 1859.

This was all the evidence in chief on the part of the defendant.

The plaintiff, to rebut the evidence on the part of the defendant, introduced the following evidence:

1.   The deposition of *James I. Dozier*, taken in Louisville, Ky., where he has resided for twenty-five years, as was testified by him on the 31st of May, 1859.   Said witness testified that he knew Edward Crow and Benjamin Hughes in their lifetime, and formerly lived near them in Shepherdsville, Ballitt county, Ky.; and that he knew Elisha L. Conant. Witness formerly sold and conveyed the land in controversy to Conant in 1835.   Witness was then asked the following questions, and testified as follows :

17th Interrogatory.   Do you or not know one Bryant Bartlett?   If yea, state when you first knew him, and where; and state if you know where he then lived, either from his information to you or any other source; state how you knew his place of residence.

Answer.   I say I have seen a man who told me his name was Bartlett, or Bartley; I believe he said Bartlett, but I cannot say on oath whether it was Bartlett; whether I should know him by the name he told me he bore, I do not know; I think I should not.   I was sick, and cannot state the time I saw him, and have seen him but once that I know of.   He told me he lived in Illinois.   At the time I saw him I was unwell, as I have been for more than ten years past, more or less. , I can and do say all the time, he came to my office in

Louisville, in the first part of the day. He inquired of me about the Crow land, and I told him I had nothing to do with it, that I had sold it to E. L. Conant, and that I had not been paid for it; still, I had sold it to Conant and it was his. He inquired for Conant's whereabouts. I could not tell him where he was. I told him I had received many letters about this land, and spoke of one received of Mr. Scofield, whom I supposed he knew. This supposition was induced because Scofield's letter showed that he knew the land, and lived at no great distance from it, and the man Bartlett, or Bartley, without telling me his point of residence, told me he was well acquainted with the land. He said he did not think the land ever belonged to Hughes or to me; that he had understood that when Crow had sold it to Hughes, he (Crow) was insane. I had never before heard of Crow's insanity, and knowing him well before he sold, and for more than three years after he had sold it, I knew the charge of insanity was false, and so told him. I told him it was an infamous lie, and that any man who said it was so, and he knew it, was a liar. He told me that he and a Mr. Rankin, and I believe he named some other man whose name I do not remember, were about buying it of Crow's heirs, expecting to hold it, because Crow, at the time of the sale, and execution of the deed to Hughes, was insane, and incapable of making a contract or deed to it. He said that Rankin, his partner, had received information from Col. Thomasson, then living in Louisville, and who was the father-in-law of Rankin. He said they were about purchasing the land from one Johnson, who was one of Crow's heirs. I told him I knew Johnson, from general report, to be a very bad man. He said he had advanced $100 towards the completion of the contract, and that Johnson had got it. My recollection is, that he said that the $100 had been paid to Johnson by Rankin, and that Rankin had got the money of him. He said he would see to that matter, and if I was right about the condition of Crow's mind when he made the deed to Hughes, he must have the money back, and he would go to see Thomasson about it, and left my room, which was about seventy or eighty

yards from Thomasson's office.  And this is my best recollection of what passed between Mr. Bartlett, or Bartley—if that was his name, as he told me it was one or the other—and myself.  I can't recollect the time more accurately than I have hereinbefore stated.  There was no one present at the time but ourselves.

19th Interrogatory.  Did you or not then learn from said Bartlett that he knew Crow had conveyed the land to Hughes, and Hughes had conveyed it to you?  State what he said touching that matter.

In answer to the nineteenth interrogatory, I can say no more than I have said in my answer to the seventeenth interrogatory, except this: I did tell the man Bartlett, or Bartley, that Crow had conveyed to Hughes, and Hughes to me, and that I had sold and conveyed to Conant.

Also, the deposition of *Elisha L. Conant*, as follows:

2nd Interrogatory.  Do you know one Bryant Bartlett? If yea, please state how you first became acquainted with him.

Answer.  I do.  I first became acquainted with him by correspondence, in April, 1854.  In the spring of 1854, 1855, or 1856, I saw him personally at the town of Hamilton, in Hancock county, in the State of Illinois.

3rd Interrogatory.  Did said Bryant Bartlett ever apply to you to purchase a tract of land situated in Hancock county, Illinois, described as the north-west quarter of Section 26, in Township 5 north, and Range 8 west of the fourth principal meridian?

Answer.  He did.  I received a letter from Mr. Bartlett, from Illinois, relative to the aforesaid land, asking me if I had any claims to said land, and if I would sell it.  I think this was about the last of April, or the first of May, 1854.  I answered his letter, but did not keep a copy of it.  I cannot say whether I directed my answer to Keokuk, Carthage, or Hamilton.  A short time after this I received one or two letters from Bartlett, from Louisville, Kentucky.  The tenor of the Louisville letters was about the same as of the other letter above mentioned, asking me if I had any claim to said land, and wishing me to write to him at Louisville.  I think he

wished me to say the lowest price I would take for said claim. I think he wrote two letters from Louisville. In consequence of not having kept a copy of said letter above referred to, I have referred to some letters from Winston and Scofield, now before me. I find it must have been the last of April or first of May, 1854. I refer particularly to the first letter from Bryant Bartlett, from Illinois.

4th Interrogatory. If said Bryant Bartlett did apply to you to purchase said land, please state whether such application was in person or by letter.

Answer. At first, by letter, as above referred to in answer to interrogatory third. Afterwards, in person, he asked me what I would take for my interest or claim.

5th Interrogatory. Please state what reply you made to such proposition or application, and whether such reply was by letter or word of mouth.

Answer. I replied by letter to Mr. Bartlett, stating that I owned said tract of land.

6th Interrogatory. The application to purchase made to you by said Bartlett, and your reply to him, were by letter. Please state whether you have his letter or letters to you, and your letter or letters, or a copy or copies of your reply or replies to him; if you have any of them, please attach such as you have to your deposition, mark them respectively A, 2, 3, and 4, and C, and refer to them by their respective marks; and if you have not such letters or copies, please state what became of them, and then state the contents of each as accurately as you can remember.

Answer. His application and my reply to him, in the first instance, was by letter. I believe his letters to me are mislaid. I cannot find them now. I may have given some of them to Mr. Breeden. If I did, he has them now. I keep no copies of my replies. I think I received three letters from Mr. Bartlett. The main subject contained in the letters was asking me if I had any interest in the above tract of land, and the lowest price I would take for it. It may be that he spoke of going to Cincinnati, and urged the necessity of an immediate reply, which I did. I replied that I had an in-

terest, that I owned the above tract of land, but did not state the terms of the sale, so far as I now remember.

7th Interrogatory. If you say you have not the said letters from Bryant Bartlett to yourself, please examine your papers and state whether you are able to find the same; or if you have heretofore searched for the same, please state whether you have been able to find the same.

Answer. I have taken a partial hunt for them, but have not found them for this occasion.

8th Interrogatory. Please state what you informed Bartlett when he applied to you to purchase the land. Did you or not inform him that you had parted with your title, and also that Edward Crow had in his lifetime sold and conveyed said land?

Answer. I do not recollect saying anything about the Crow deed in my letter. I think Mr. Winston or Mr. Scofield, as my friends, did.

9th Interrogatory. Did you not inform the said Bartlett that the title you had formerly owned was derived through a deed of conveyance from Edward Crow to Benjamin Hughes?

Answer. I cannot say positively that I did, as I have not a copy of my letter, though I presume I did. I think Mr. Winston or Scofield did. I supposed Bartlett knew the fact by the tenor of his letters to me.

10th Interrogatory. Did or did not said Bryant Bartlett, when he made such application, state that it appeared from the records of Hancock county, Illinois, that you had some claim to said land, and that he had for some time been endeavoring to learn your whereabouts?

Answer. I cannot say that he did.

11th Interrogatory. If you know anything further of interest or advantage to either of the parties to this suit, please state it fully.

Answer. I know nothing further.

1st Cross-Interrogatory. When and where did you first see Bryant Bartlett? How many times did you ever see him, and where was he at each time you saw him, and how long were you with him at each time respectively?

Dickenson *v.* Breeden.

Answer. I saw Mr. Bartlett at Hamilton, Illinois, and I think I only saw him once, in the summer of 1854, 1855, or 1856. Cannot say for certain which of these three years. It may have been directly after his trip to Louisville, Kentucky, which was in 1854. I do not think I was with him more than one or two hours.

2nd Cross-Interrogatory. If you say, in reply to the direct interrogatories, that Bryant Bartlett ever communicated with you in any ‘manner, in relation to the north-west quarter of 26, 5 N., 8 W., in Hancock county, Illinois, at what precise time or times was such communication? Was it in writing? If yea, attach the communication to your deposition; if oral, who was present at each time, and state all that said Bartlett said to you at that time in relation thereto.

Answer. I received a communication from Mr. Bartlett, asking me if I had any interest in the aforesaid quarter section of land. The first was from Carthage or Hamilton. I think it bears date about the last of April or first of May, 1854. His letter I cannot find at this time. By referring to letters from Scofield and Winston, relative to said land, I think it was from the 15th of April to the 1st of May, 1854. The other letter which he wrote me, was from Louisville, Kentucky, immediately after the above mentioned letters, all of which were relative to my owning an interest in the said lands. After Mr. Bartlett made the trip to Louisville, Kentucky, I met him at Hamilton, Illinois. I saw him alone, at which time I asked him if his name was Bartlett, and if he was the man who wrote to me about the land. He replied, he was. After talking a few minutes, he said he had sold it I think he said to a man by the name of Dickenson. He said he would introduce me to him. I think we found Dickenson in the garden at work, in Hamilton. I offered to pay Dickenson for all the taxes he had paid, if he would give it up to me. Dickenson told me his title was good, as Bartlett had procured the deed from Crow's heirs. I told Dickenson I did not care for his title, for I could prove that said Bartlett had notice of my title before purchasing from the heirs of Crow. At this instant Bartlett and Dickenson stepped a few steps aside, and

after consulting a few minutes about the time of my leaving them, one of them said: "We will give you about the expense of a law suit for my interest," supposing it be about fifty dollars. Bartlett, previous to introducing me to Dickenson, wished to know of me what I asked for my interest in the lands, as described above.

3rd Cross-Interrogatory. Did not said Bartlett inform you at the time he made such communication to you, either written or oral, that he had purchased said premises from the heirs of Edward Crow?

Answer. He did not, except as above mentioned, in answer to second cross-interrogatory.

4th Cross-Interrogatory. Did not said Bartlett, at the time of said communication with you, inform you at the time he purchased said premises from the heirs of said Edward Crow, he had no knowledge or notice of said Crow ever having deeded said premises to any person, or that any person, other than the heirs of said Crow, claimed the patent title to said land, or words to that effect? and declare fully what he did say in said communication with you.

Answer. I do not remember that in any communication, either written or oral, that he spoke of having purchased from Crow's heirs.

Also the affidavit of James W. Breeden, as follows:

JAMES W. BREEDEN, } Circuit Court, in and for Hancock County, Illinois.
    *vs.*                   In Ejectment.
HENRY R. DICKENSON. }

James W. Breeden, plaintiff aforesaid, being first duly sworn, deposes and says, that he has not now, and never has had, in his possession, or under his control, a letter written by Bryant Bartlett, from Illinois, to Elisha L. Conant, about April or the first of May, 1854, alluded to by said Conant, in his deposition taken in this case, and that he does not know in whose custody, nor under whose control said letter is, and never has known, and has both written to Conant and pressed him verbally, to try to find said letter, and that he (Conant) always replies that he cannot find it, after much search for it.

                                        J. W. BREEDEN.

Dickenson *v.* Breeden.

STATE OF KENTUCKY, } *ss.*
COUNTY OF JEFFERSON.

Sworn to and subscribed before me, Michael Murphy, a commissioner of deeds for the State of Illinois and Kentucky, by said James W. Breeden, well known to me, this 29th day of February, A. D. 1860, at my office in said city of Louisville and county aforesaid.

In testimony whereof, I have hereunto set my hand and affixed my official seal, as commissioner in Kentucky for the State of Illinois, the day and year aforesaid.

[L. S.]
MICHAEL MURPHY,
*Commissioner for State of Illinois.*

To the reading of each of which answers in Conant's deposition, and said affidavit of Breeden, said defendant at the time objected ; which objection was overruled by the court, and the defendant then excepted ; no objection being made to the form of either said deposition or affidavit, but only to their legal effect.

Also a letter, dated Louisville, June 2, 1854, admitted to be in the handwriting of Bryant Bartlett, and also the directions thereon, admitted to be in his handwriting, as follows :

E. L. CONANT, ESQ :

*Dear Sir:* I find by the records of Hancock county, Illinois, that you have, or have had, some claims upon a quarter section of land in said county of Hancock, viz., north-west quarter of section twenty-six.

The writer is in possession of said land, and desirous of perfecting the title to the same, can afford, probably, to give you more for your rights to the same, than can other applicants, which you will probably have about this time. So if you have not sold, you had better not do so, until I see or hear from you.

I have but this moment learned your present whereabouts—had expected to find you here. Please drop me a line upon the receipt of this. Direct to Keokuk, Iowa. If you should receive this in time to have an answer 'reach me at Cincinnati, Ohio, before the 10th of this month, I could come down and see you before my return home, that is, if you have not sold. Please write, however, to both places whether you have sold or not. I can have your Cincinnati note (should it not reach me in time) forwarded to some other point in the neighborhood of Cincinnati, several of which I have to visit before I return home. Will you, sir, be kind enough to answer this instanter, as requested, whether you have sold or not, as it will make considerable difference with my other arrangements.

Yours, in haste,
BRYANT BARTLETT.

Dickenson *v.* Breeden.

On the back of said letter appears the following:

[Stamp.]

Louisville, Ky., June 4.

E. L. CONANT, ESQ.,

MEMPHIS, TENNESSEE.

The plaintiff then called as a witness, *James A. Winston*, who testified in chief as follows:

I have been acquainted with the N. W. 26, 5 N., 8 W., in Hancock county, Illinois, for ten years or more. My attention was called to it by looking for the title to it, to purchase. In looking up title to lands, I went from this county to Memphis, Tennessee, to see Elisha L. Conant, to purchase of him this land, and three or four other quarters he had. I supposed that Conant lived at Memphis, but when I got there, I was informed that he lived at Evansville, Indiana. I left here in March, 1854, not later than the 10th of that month. I went from Memphis to Evansville, and there saw said Conant. I also went from Evansville to Louisville, to hunt the papers for land, and there saw James I. Dozier. There was no title of record to said Conant for this land. I have known Bryant Bartlett since the year 1847. I never saw the patent or title papers of the said quarter section of land exhibited to said Bartlett. The record showed a deed from Dozier to Conant, and I supposed that Conant had the patent title.

I know the defendant Dickenson. Said Dickenson, in a conversation with myself and Bryant T. Scofield, told us that the person owing the patent title to said land, had been to Hamilton, and saw him and said Bartlett; that he got off a boat; that he lived in the south part of the State, and had all the original title papers of this land with him, bringing the patent title from the patentee down to said Conant. He gave the name of the man, but I cannot state the name. He asked us if we had seen him, and if he had been to Carthage. This conversation was after I had been to Louisville and Memphis, and was a few days before or after the assignment from said Scofield to said Bartlett and Dickenson, of the bond for the land, given in evidence. I think it was about the time said Scofield and myself were negotiating the sale of the tax title to said Bartlett and Dickenson, in which, though the bond

run to Scofield alone, I was equally interested with him. I think this conversation was before Bartlett and Dickenson bought the patent title; at least, he said nothing about having then purchased the patent title. I think we were sometime negotiating the tax title to Bartlett and Dickenson.

It was shortly after my return from seeing Conant, that conversation occurred. 1 got back about the 1st of April, 1854; think Bartlett and Dickenson not in possession at this time; think there was no improvement on the land at the time of the said conversation.

Cross-examination. This conversation was in Hamilton, Hancock county, Illinois. Scofield and myself were in a buggy; said Bartlett was on foot; said Bartlett was not present. Dickenson, in the conversation, mentioned the name of the man who had been there with the patent title papers. I did not think that any man had been there; I thought he said what he did to cheapen our tax title. The man Dickenson named, was not any of the names figuring on the record, or that I had traced out as connected with the patent title.

The time of this conversation may be later, but I think it was about the time of the assignment of said bond, by Bryan T. Scofield, to said Bartlett and Dickenson. I think it was soon after I returned from my trip, and I returned about the first week of April. I do not recollect of ever having had any conversation with said Bartlett about the land. In my investigations, I had traced out the persons the patent title would come through, and none of them lived in Illinois.

The plaintiff then called as a witness, *Bryant T. Scofield,* who testified in chief as follows:

I have not the bond or contract for the land to me from William Couch, Abijah Fisher and Robert Schuyler. I got it in the spring of 1854. I cannot state the date; I have no means to fix the definite period when I got it; I think I assigned it over to Bryant Bartlett and the defendant Dickenson, the next day after I got it.

Cross-examination. I cannot say whether at the time I assigned said contract to said Bartlett and Dickenson, I knew that they had purchased the land from the Crow heirs.

The defendant then asked the witness the following questions, viz.:

State whether or not, at the time you signed said contract to said Bartlett and Dickenson, they were claiming the land under purchase from the Crow heirs. To which question the plaintiff objected, and the court sustained said objection, and refused to permit the witness to answer the same; to which said opinion and decision of the court, in sustaining the plaintiff's objection to said question, and in refusing to permit the witness to answer the same, the defendant then and there excepted at the time said opinion and decision of the court was made.

The defendant then called *Bryant Bartlett*, as a witness, who testified as follows, viz.:

The defendant Dickenson and myself purchased the N. W. 26, 5 N., 8 W., in Hancock county, Illinois, of the Crow heirs. In April, 1854, M. T. Johnson came to Hamilton and represented himself as the agent of the Crow heirs, and had letters showing him to be such. He went on to the land with said Dickenson and myself, and we purchased the land of him. He was to return and procure a deed from the Crow heirs to us, as soon as practicable. He did procure the deed to us, from Samuel Crow, Elizabeth Crow, Mary Louisa Griffith and John Griffith, dated May 13, 1854, which has been given in evidence. On the day of the purchase, we took a bond from him for the land, and returned the bond on getting the deed. We paid him, when we took the bond, either $75 or $100. The deed was sent to Mr. Rankin, of Keokuk, Iowa, as agent for the Crow heirs, who delivered it to us, and the bond was returned to him.

Plaintiff objected to all testimony about any such bond, unless produced or accounted for.

I am not aware of any negotiation with James A. Winston and Bryant T. Scofield, about the land, before the purchase from the Crow heirs. On the 2nd or 3rd of June, 1854, defendant Dickenson and myself bought of Bryant Scofield his contract for the tax title to said land. I think that was the first of our negotiations for it. There might have been

loose talk of it a day or two before. I understood before, that said Scofield had a contract for the land.

Plaintiff objected to any evidence about assignment of bond, unless assignment be produced or accounted for.

I live at Hamilton, Hancock county, Illinois, a few miles from said land, and have lived in said county ever since 1840. The first letter I ever wrote to Edward L. Conant, I see on the table, dated Louisville, June 2, 1854. That is the correct date. I never knew where he was before that time; never saw him or conversed with him before that time.

I had understood before I bought of the Crow heirs, that the record showed a deed to Conant for the land.

I was informed, before said Dickenson and myself purchased from the Crow heirs, that the name of Conant figured on the records, in relation to some paper or deed in relation to the land. I had never examined the record, or the abstract or index book of deeds on record in the recorder's office. I had seen a paper which I was informed was a copy from the abstract or index book of deeds in the recorder's office, giving the names of the parties to deeds on record, and the book and pages in which they were recorded. I supposed this to be a correct abstract or index of deeds, but I had never examined the original abstract or index book, nor the record of deeds.

Witness was then shown the tract abstract book from the office of the circuit clerk, so far as relates to the land in controversy, and which is herein copied at the end of his testimony, and stated that the abstract shown him contained the same reference to deeds, parties, books, and pages of record, as the copy hereto annexed at the end of his evidence. Till my letter to said Conant, written at Louisville, June 2, 1854, had never had any communication or written any letter to said Conant, about said land. I did not think he had any title, and did not know he was living, or where he was. I never had any communication with James I. Dozier, prior to the time said Dickenson and myself purchased the land and got the deed from the Crow heirs. I never saw him, or had any communication with him, prior to the 2nd day of June, 1854. On that day I saw him at Louisville, Kentucky. I was mis-

taken, in the former part of my evidence, in saying that defendant Dickenson and myself purchased of said Scofield on the 2nd or 3rd of June, 1854, his contract for said land. It must have been as late as the 10th or 12th of June, 1854, that we made the trade with Scofield. It was immediately on my return from Louisville, Kentucky. I had a conversation with said Dozier at Louisville, Kentucky, on the 2nd of June, 1854, about this land. I told him of our purchase of the Crow heirs. I never conversed with him at any other time, or saw him, or corresponded with him.

I never told said Dozier that Rankin, myself, and other men, were about to purchase the land from the Crow heirs, and expected to hold it, because Crow was insane when he made a deed to Hughes, nor words to that effect, or anything like it. I said to Dozier, that myself and partner had purchased the land from the Crow heirs, some weeks prior to my coming to Louisville; that I had, while in Louisville, understood that Crow was not in a mental condition to do business for some years after leaving the army; that he had been for many years under the care of a guardian, on account of inability; and that, therefore, I did not believe that any purchase from Crow, that he was telling me about, was of any account. Dozier was at that time an old and very infirm man.

Many years ago, one Silkwood, in Green county, Illinois, claimed a patent title to this land. Some time before Dickenson and myself purchased the land of the Crow heirs, I went to Green county, to ascertain what that claim consisted of, supposing he had the patent title. I ascertained he had no title at all, but a mere agreement to pay taxes on land given by Crow before his death, with some condition about rents. Never heard of any other claims to the land. Since my letter of the 2nd of June, 1854, I have corresponded with Conant.

Cross-examination. Before Dickenson and myself purchased the land of the Crow heirs, I had an abstract from the abstract of deeds, for his land in the recorder's office of said Hancock county. I never had seen the original abstract or index to deeds for this land in the recorder's office, nor read the deed on the records. I supposed the abstract or index I

had was correct. I cannot now state accurately all the contents of it. I think it showed a deed from Dozier to Conant.

Witness again identified the abstract book from office of clerk of Circuit Court of Hancock county, Illinois, a copy of which, so far as relates to this land, is hereto attached, as being the same as the abstract that he had before he purchased this land.

At the time I was at Louisville, in June, 1854, I left home for Louisville, Cincinnati, and several other places, on business, a part of which was looking up titles to lands. I saw the Crow heirs at Louisville. I was aware that Conant's name figured on the record to this land, and I wrote to him about it, because if he had any real claim, I wanted to get it. Dickenson and myself wanted this land for our own use, and I wanted to get up all shadow of claim to it.

It was then admitted by plaintiff and defendant that all the deeds of each party, which are hereinbefore stated to have been recorded, were recorded at the respective times hereinbefore stated, in the proper recording office of deeds, in the county of Hancock and State of Illinois.

The defendant then produced the original abstract book, or tract index book, of deeds, for lands in the recorder's office of said Hancock county, before referred to by said witness Bartlett, showing all the deeds recorded in said office, for the land in controversy, to the 13th day of May, 1854, and read the same in evidence, in the words and figures as follows, to wit:

| | |
|---|---|
| Edward Crow, N. W. 26, 5 N., 8 W., | Book. |
| S. B. Munn to Moulton and Nevins, | B. 358 |
| C. F. Moulton to Nevins, Schuyler & Co., | B. 370 |
| James I. Dozier to E. L. Conant, | B. 464 |
| Godfrey Gunner to Joseph Kinney, | F. 227 |
| Joseph Kinney to John Collins, | K. 262 |

This was all the evidence in said cause, and thereupon the court found defendant guilty of unlawfully withholding from plaintiff the possession of said premises, and rendered judgment against him for possession thereof, and for damages and the costs of this suit. To which finding, judgment and decision of the court, the defendant then and there excepted—bill of exceptions filed.

The assignments of error are:

The court erred in overruling the objection of the defendant to the deposition and evidence of E. L. Conant, and allowing the same to be read in evidence.

The court erred in receiving secondary evidence of the contents of letters of Bryant Bartlett, when objected to by the defendant, without the originals being sufficiently accounted for.

The court erred in holding the affidavit of Breeden to sufficiently account for the absence of the original letters of said Bartlett, when objected to by defendant.

The court erred in finding the defendant guilty, and rendering judgment against him for said possession, and damages and costs.

The finding and judgment of the court was against the evidence, and should have been for the defendant.

The court erred in overruling defendant's motion for new trial.

The court erred in refusing to allow the witness Scofield to answer the question propounded to him by defendant.

BROWNING & BUSHNELL, and G. EDMONDS, JR., for Appellant.

I. Dickenson has shown a paramount patent title to the land, unless Breeden has impeached it by proving that Bartlett and Dickenson had notice of Conant's title at the time they purchased of the Crow heirs, on 13th of May, 1854.

1. It is insisted that such notice is proven by the deposition of Conant, and letter of Bartlett of June 2nd, 1854.

2. By the deposition of Dozier.

3. And by the recitations in a recorded deed from Dozier to Conant, dated 8th October, 1835, recorded 10th September, 1836.

II. The deposition of Conant was improperly admitted to prove the contents of Bartlett's alleged letters to him, and also the contents of his letters to Bartlett. There is no pretense of their loss or destruction, or that any proper search has been made for them. Answer to Int. 17.

20

Dickenson *v.* Breeden.

1.   The affidavit of Breeden only shows that he has applied to Conant for the letters of Bartlett, and did not get them. He does not show that they are lost or destroyed, or when he made the application, nor does he append Conant's letter to his affidavit.   The affidavit was made on the 29th of February, 1860, more than two years before this trial.

2.   Nothing is shown by Conant's deposition, in whose possession they should be, that they are lost or destroyed, or that they are not in his possession, or that he has made a proper search for them.   In the answer to the 6th question, he only says : I believe " his letters to me are mislaid."   To the 7th question, he says : " I have taken a *partial* hunt for them, but have not found them *for this occasion*."   In his answer to the second cross-interrogatory, referring to the alleged letter of Bartlett, of the last of April or the first of May, 1854, he says : " His letter I cannot find at this time."   This is all of Conant's evidence as the loss or destruction of these pretended letters. He does not state that they are lost, mislaid or destroyed, but only that he *believes* them to be mislaid, and that he could find, not all, but *one* of them, at that time, and this even carefully qualified by the statement that he has made only a " partial hunt " for one occasion.   This evidence not only does not prove, but on the contrary disproves the idea of his having made a careful, deliberate and systematic hunt for them. It furnishes no legal evidence that they, or any of them, are destroyed or lost.   *Mariner* v. *Saunders*, 5 Gilm. 115, 117, 118.

3.   There is no proof whatever that the pretended letter of April, or the first of May, 1854, or that any other letter prior to that date, June, 1854, was written by Bartlett.   Neither Conant nor any other witness so testifies.   Conant had then never seen Bartlett, nor does he pretend to be acquainted with his handwriting, or that the letters were written by him.   Before letters or their contents can be given in evidence, it must certainly be properly proved that they were written by the party whose letters they are claimed to be.

And Bartlett says, " Until June 2, 1854, I had never had any communication or written any letters to said Conant."

Contradicting, positively, the statement of Conant as to letter of April or first May, 1854.

4. Were Bartlett the defendant in this suit, and the party to be affected by the evidence, the only legal evidence, even as against him, tending to prove that he wrote any letter prior to June 2, 1854, is the statement in Conant's deposition that when he saw Bartlett in Hancock county, in reply to Conant's inquiry, he said, " he was the man who wrote to me (Conant) about the land." At the time this admission was made, Dickenson was not present. Conant and Bartlett were alone. Conant had not then seen Dickenson. Now when did Bartlett say this? It must have been in the summer of 1854 or 1855 or 1856. If it were in the earliest year, the summer of 1854, it was subsequent to the purchase of the land by Bartlett and Dickenson from Crow's heirs, which was on the 13th day of May, 1854. If it be conceded that Bartlett was the acting party in making the purchase of Crow's heirs, and that Dickenson is to be affected by his acts or admissions made in pursuance of, and during the continuance of his agency, this agency ceased when the purchase was completed. No act or admission of his, after that time, can be used against Dickenson. True, by the deed, they became tenants in common in the land. But tenants in common hold, though undivided, yet distinct interests, and are not, like partners, mutual agents of each other. If, after the purchase was complete, Bartlett admitted a fact which occurred during his agency, as against Dickenson, the fact, not Bartlett's admission of it, must be proved as a fact, by competent evidence. Bartlett's conversations or admissions, made at that time, were, as to Dickenson, *res inter alois acta.*

But further. This admission of Bartlett was not made in the summer of 1854, but two years afterwards. Conant does not pretend that he ever saw Bartlett but once, but in his answer to the first cross-interrogatory, he leaves it in doubt whether this was in the summer of 1854 or 1855 or 1856.

But his answer to the second cross-interrogatory removes this doubt, and shows that it was in the summer of 1856. Before he had seen Dickenson, Bartlett told him that he sold the

land to Dickenson. Bartlett took him to Dickenson and introduced him. Conant offered to refund Dickenson his taxes. The latter claimed that his title was good. Conant replied that he did not care for his title, and they separated without coming to any agreement. This shows that in that interview, in Dickenson's garden, all parties treated Dickenson as the owner of the title from Crow's heirs. By recurring to the record, we find that Bartlett conveyed to Dickenson, February 1, 1856. Conant then first saw Bartlett, and Bartlett made this admission to Conant in the summer of 1856. This was months after Bartlett had parted with his title to Dickenson. Can it be pretended that the statements of Bartlett, made after he had conveyed the land, can be given in evidence against Dickenson, to defeat that conveyance? Most unquestionably not. If, as before stated, that admission is true, let its truth be proved, by evidence competent to prove a fact, and not by proof of what Bartlett said about it at a time when he had no interest to be affected by his statements.

5. There was no foundation whatever laid for the introduction of Conant's evidence as to the contents of his own letters. They do not appear to have been lost, mislaid or destroyed. They are shown to have been addressed to Bartlett, who is shown to be a resident of Hancock county, the very county in which the trial was had. These letters, if any such were written by Conant, should be in Bartlett's possession. Yet, when he is produced as a witness, the non-production of the letters are not accounted for, or offered to be; but on the contrary, Bartlett swears most positively he never wrote or received any such letter; and that the first letter he ever wrote to Conant was the one in the record—and that before that time he did not know where Conant resided; and that that letter is correctly dated.

6. The letter of Bartlett to Conant, dated June 2, 1854, was improperly admitted in evidence against Dickenson. That letter was written after the title to Bartlett and Dickenson had been acquired from Crow's heirs,—and, therefore, after any agency of Bartlett in making the purchase had ceased, and when no act of his could affect Dickenson.

III.   Admitting Conant's deposition, and Bartlett's letter of the 2nd of June, 1854, in evidence, there is still no sufficient proof that Bartlett and Dickenson, or either of them, had notice of Conant's title at the time they purchased of Crow's heirs.   This notice, to deprive Dickenson of his clear legal title, must be clear.   The only evidence of the notice in the record is, the depositions of Conant and Dozier, and the above letter of Bartlett.

1.   The deposition neither proves that the person Dozier refers to was Bryant Bartlett, or who he was, or what his name. What he says of himself proves nothing till he is in some way identified.   Even admitting it to have been Bryant Bartlett, the deposition in no way indicates the time at which the conversation occurred, and is of course no proof that it occurred prior to the 13th of May, 1854.

2.   The letter of Bartlett of the 2nd of June, 1854.   This letter can in no respect prove, or tend to prove, notice to Bartlett and Dickenson of Conant's title, when they purchased of Crow's heirs before it was written.   But it does prove one thing very clearly, and that is, that Conant's testimony as to the suppressed pretended prior letters of Bartlett, is entitled to a very doubtful credit.   This letter bears no indication of being the sequel to a series of letters.   It makes no allusion to any former letter.   Its contents, mode of expression, and its whole air and manner, furnish an almost conclusive indication that it was Bartlett's first letter on the subject; and tends strongly to the suspicion that no other pretended letters were written, or if at any time written, their dates were unsatisfactory.   If written, why are they not produced?   Can any reasonable explanation be given, why, as this was preserved, the others were not preserved also?   No explanation is attempted.   The reason is left a blank.   And Bartlett's denial that he ever wrote such letters to Conant, leaves the irresistible conclusion that Conant is mistaken about having received such letters.

3.   The deposition of Conant.   We find this deposition, as already suggested, subject to grave suspicion.   But waiving that, let us try it by itself.   Conant is testifying from memory,

as to a precise point of time, after the lapse of more than five years. He first says he became acquainted with Bartlett in April, 1854. He next says he "thinks" it was "about the last of April or the first of May, 1854." He again says he "thinks" he received Bartlett's first letter about the last of April, or the first of May, 1854. To still further show his wavering recollection, he again says he "thinks" Bartlett's first letter was dated about the last of April, or the first of May, 1854. These different modes of expression import a difference of days, and yet, in this case, days are material. If in testifying from memory, after the lapse of five years, he has in these expressions of his recollection or belief mistaken, and has placed the time thirteen days before the true date of that letter, there was no prior notice. Indeed, in order to place the date of that letter subsequent to the 13th of May, it is not necessary to assume that he is mistaken. He does not pretend to fix the precise time. It is "about" the last of April or "about" the first of May. What is the latitude to be given to "about" in a witness testifying from memory, after the lapse of years? It is for the plaintiff to prove notice. Are such loose statements, of belief only, where the slightest mistake would be fatal, to be held to be clear proof required *to destroy a legal title to land?* So far can this be from proving the letter to have been dated prior to the 13th of May, that what follows in his deposition almost conclusively proves it to have been after that time. "A short time after this," says he, "I received one or two letters from him from Louisville." Did he receive "one" letter from Louisville, or "two"? As we have one letter from there in the record, and know of no other, and as he does not state he received more than one, we must presume there was no other from that place. As to the date, both of this first letter, and of the Louisville letter, he was testifying from memory. Fortunately we know from the record the date of this Louisville letter, and when it was mailed. It was dated the 2nd of June, and was mailed on the 4th of June, and must have been received by him some days afterwards. Is this "soon after" the last of April or the first of May? And if his memory so confounds these

dates, or this is his idea of when one event follows " soon after" another, what construction, in respect either to his memory, or to his judgment, shall we give to his "about" in reference to the date of the first letter, or to the time at which he received it. Does this comparison of his ideas or memory, tested by the actual date of one letter, of which we know, clearly prove that the date of the other was prior to the 13th of May. It simply proves, that if he ever received any such first letter, he has no distinct knowledge or recollection of its date or when received. After a "partial hunt" he does not produce it. He kept no copy of his reply. He has therefore neither of these to refresh his memory by. But, says he, " by referring to letters from Scofield and Winston, relative to said land, I think it was from the fifteenth of April to the first of May." He had already said he thought it about the last of April; he now places it possibly as far back as the fifteenth of that month; and yet, with this reference to letters not written by himself, and of which he knew neither when nor from whence they were written, he concedes an uncertain margin of fifteen days—when a mistake or error of thirteen days in his last date, places the letter after the 13th of May, as it must have been, if as he had already testified, the letter from Louisville in June, was " soon after" the first one, unless, in violation of the evident meaning and understanding of the witness, we make this "soon after" cover a period of nearly two months. In all this we do not object to the witness, that he does not recollect. We only object that he cannot recollect, that no honest witness can recollect precise dates, after such a lapse of time, and that the deposition taken together, shows that Conant is no exception to the rule. And yet in this case, precise dates are material—and if not proved with precision, and clearly proved, there is no proof of notice affecting the case. For this deposition is in fact the only evidence in the record touching, or tending to prove prior notice. If this does not prove it, it is not proved—and if titles to land are to be set aside upon such vague and unsatisfactory testimony as this, and that too, of a witness who, if not interested in fact, is naturally interested to sustain a title derived through

himself, and whose testimony, as already suggested, is otherwise subject to suspicion, we can only say that our titles to our estates are held by a very uncertain tenure.

Thus far we have considered the question of prior notice principally, on the proof offered by the plaintiff Breeden. We see that by his own showing he relies only on the uncertain testimony of a witness testifying without any precision as to dates, and of doubtful and questionable circumstances, and that from mere memory, and after a great lapse of time. It is not denied that Dickenson, the defendant below, is a purchaser for a valuable consideration, entitled to the protection of the statute and the court, unless full and clear notice of the prior deed from the patentee is brought home to him by the evidence. Certainly the plaintiff's evidence falls very far short of proving clear notice to him of such deed. It can at most raise a suspicion or a doubt of full notice, but cannot establish it clearly in a judicial mind as a fact, clear and indisputable.

Now, Bartlett himself is produced by the defendant Dickenson. It is not pretended that Dickenson had notice, but it is insisted that Bartlett had. Bartlett knows whether he had or not. He has no interest in the land, nor in this suit. He stands in the case as a witness unimpeached and unimpeachable. He denies this actual notice positively, and fixes the time and dates of the letter and the circumstances out of which the defendant Breeden would argue notice, in such a manner and with such a precision, and with such means before him of fixing these things correctly, that the court can see clearly on what grounds he testifies as he does, and that it is not possible for him to be mistaken. His testimony completely repels any suspicion of notice, which any one could conceive as existed by the evidence of Dozier or Conant. For this we have only to look at his testimony on this point. Conant, in his deposition, represents his letters to Bartlett as having been written in reply to Bartlett's to him; that the correspondence was commenced by Bartlett. Now Bartlett testifies positively that he never wrote any letter to Conant prior to the letter of June 2, 1854. That that was his first

letter, which we have seen, is proven by the tenor of the letter itself. Bartlett, in his testimony, says: "The first letter I ever wrote to Edward L. Conant, I see on the table, dated June 2, 1854. That is the correct date. I never knew where he was before that time. Never saw or conversed with him before that time." Again, he says: "Till my letter to said Conant, written at Louisville, June 2, 1854, I had never had any communication or written any letter to said Conant about said land. I did not know he had any title, and did not know he was living, or where he was." "Since my letter of the 2nd of June, I have corresponded with Conant." This fixes positively the time when Bartlett first wrote to Conant, against the, at least, uncertain memory of a witness, after years have transpired, fixed by the aid of his own letter before him, which, in its very tenor, confirms his statement.

So also, if it is admitted that Bryant Bartlett is the person who had a conversation with Dozier, Bartlett, in his testimony, fixes the time of that conversation. He says: "I never had any conversation with James I. Dozier prior to the time said Dickenson and myself purchased the land, and got the deed from the Crow heirs. I never saw him or held any conversation with him, prior to the 2nd day of June, 1854. On that day I saw him at Louisville, Kentucky. I had a conversation with said Dozier at Louisville, Ky., on the 2nd of June, 1854, about the land. I told him of our purchase of the Crow heirs. I never conversed with him at any other time, or saw him, or corresponded with him before. He was at the time a very old and very infirm man." This is not in conflict with Dozier's statement of the conversation, but it fixes the time of it, which Dozier does not; and here again, Bartlett could not well be mistaken as to the time, for he was then at Louisville on business, and was testifying with one of his own letters written from that place before him, by which he could fix the date of the conversation. He says, however, that he never told Dozier that he was about to purchase the land, but that he had purchased it of the Crow heirs. And the deed from the Crow heirs, several weeks before, proved the truth of the statement; and that the old and infirm Dozier, testifying to a conversation five

years before, had misrecollected, and converted an expression as to what had happened, into one as to what was about to happen, against the manifest real facts as to the date of that conversation, and that Bartlett had, on the 13th day of May previous, got the deed from the Crow heirs. No weight can be given to this old, frail man's memory, when he says that Bartlett said he was about to purchase, when we see he had already purchased and got his deed.

But it is further insisted by the defendant in error, that the recording of the deed from Dozier to Conant in 1836, reciting a deed from Crow, the patentee, to Dozier, was notice to Bartlett and Dickenson, that Crow had conveyed to Dozier, though no deed from Crow to any one was recorded till years after the recording of the deed from Crow's heirs to Bartlett and Dickenson.

The first remark which it seems proper to make to this objection is, that no deed from Crow to Dozier is shown; none such was ever made; that recital is false, and if Bartlett and Dickenson had known of this deed of Dozier, to Conant, and of the recital in it, by no diligence or inquiry could they ever have found any such deed. If that recital was notice of anything, it was notice of the recited deed which did not exist; and it will be time enough to hold us bound as having notice of that deed when it is shown that any such deed existed. This, we think, is a pretty good illustration of the propriety of sending parties who desire to purchase land to hunt into every collateral deed, because it happens to be recorded, made by parties who, on the index books required to be kept by law, have no apparent connection with the source of title.

In commencing this case under the recording laws, we start from the principle established by the court, that subsequent purchasers from the heirs of the patentee stand on the same footing, and are protected in the same manner and to the same extent as if the subsequent purchase had been made from the patentee in his lifetime. *Kennedy* v. *Northup*, 15 Ill. 149.

The doctrine of notice under the recording laws, is based on the idea of bad faith and fraud. The recording of a deed

is held to be notice of itself; and because of its contents being spread out upon a public record, which every one does or may examine, it is considered that a party purchasing with this knowledge or appropriate means of knowledge, is a fraud on the party whose deed is recorded. But to have this effort of fraud actual or implied, the knowledge must be actual, or must be implied from the neglect of such subsequent purchaser to examine a recorded deed by the rules of law he is required to examine. 4 Kent Com. 171, 172; 40 Law Library, 165—170; *Spafford* v. *Weston*, 29 Maine, 140.

Now, no rule of law seems more clearly settled by adjudged cases, than that the recording of a deed is only evidence of notice to subsequent purchasers, who derive their title under the same grantor. A purchaser is not required to examine the record of deeds made by strangers not connected with the source of title. In this case, any person claiming under Dozier would be required to take notice, by the record of his deed to Conant, that Dozier had conveyed. We do not claim from Dozier, but under Crow's heirs, and there was on record no deed showing that Crow had conveyed.

In the case of *Bates* v. *Northup*, 14 Pick. 224, 230, 231, Justice Wilde, in delivering the opinion of the court, says: "There is no evidence of any notice to Blodgett. It has been argued that the registry of the deed is presumptive notice; but we think not. It is only evidence of notice to after purchasers under the same grantor. To hold a purchaser of lands to take notice of the record of deeds to determine whether some stranger has, without right, made conveyances of their lands, would be a most dangerous doctrine, and cannot be sustained with any color of reason or authority."

In another case the court says: "But the fact that Clark had conveyed the premises to the defendant, would not afford one who wished to purchase the lands of Greeley any satisfactory evidence that Clark purchased of Greeley, or had a right to convey to the defendant. The record cannot be regarded as giving notice of any facts not stated in it, or not to be expected in the ordinary course of business to be found in it." *Roberts* v. *Bowen*, 23 Maine, 165.

In another case the court says: " As to this it suffices to say that the provision in the recording acts is intended for the protection of purchasers against previous grants by their own grantor, of which they were ignorant." *Embury* v. *Conbury*, 2 Barb. S. C. R. 98, 109.

To the same purport, amongst other cases, we refer to the following : *Tilton* v. *Hunter*, 24 Maine, 29, 34, 35 ; *Tilton* v. *Pitman*, 14 Georgia, 530, 536 ; *Lightner* v. *Mooney*, 10 Watts, 407, 412 ; *Seeley* v. *Wolf*, 10 Ohio, 80 ; 40 Law Library, 161, 162 ; *Wallace* v. *Crapps*, 2 Strobh. 266.

As a deed made by an apparent stranger to the source of title, Bartlett and Dickenson were therefore not required to take notice of the deed from Dozier to Conant, or to know its contents or recitals. Those recitals would only operate as between the parties to that deed and those claiming under it by way of estoppel to pass the estate to the grantees, and preclude inquiry as to the truth of the recited fact. It binds or affects only those who claim under that deed. The record of the deed has no effect as to strangers to it, because it does not by the records, and by the abstract of names of the parties to deeds required by law to be kept, and by which only can the examination of records be practically made, appear to be connected with any prior grantee of Crow, or with Crow himself. To this point the decision of the court in the case of *Felton* v. *Pitman*, 14 Georgia, 530, is most sensible and pertinent. Say the court in that case : "Mr. Pitman is about to purchase lot No. 374 of Allen Marshall, who informs him that he derived his title from Mrs. Jane Carlisle, the only heir-at-law of Benjamin Carlisle, and also from the estate of said deceased· How could the registration of deeds from Sullivan to Marshall, and from Marshall to Ruskin, put Mr. Pitman upon inquiry as to the ownership of this land ? He searches the records alphabetically to see whether the Carlisles, husband or wife, his original grantors, had conveyed. He finds no deed passing out of them. What is there on the books to direct his attention or inquiry to the deeds executed by other persons, having no connection with the Carlisles ? We look to the index for the names of the grantor and grantee, and not to the body of

the deed to see what property they conveyed. Such a rule would devolve upon every citizen, for his safety and security, to search the books in the clerk's office, almost as diligently as his bible, to see what property was passing from hand to hand through the entire community. It would be practically to convert him into that most odious of characters, a busy-body in other people's matters."

As to the alphabetical index required to be kept, see Revised Laws of 1845, page 432, section 7.

The recitals in deeds, like recording, only affect those claiming under the same grantors—as notice, they only affect those claiming under them, and who by the rules of law, are presumed and required to know of them. I have searched in vain to find any case in which a subsequent purchaser was charged with presumptive notice of a deed, or of any recital in it, made by a party who was an apparent stranger to the title, and who did not, by any recorded deed, connect himself with the prior owner of the land. All the adjudged cases confine the effect of recitals to parties claiming under the deeds containing the recitals,—they do not affect strangers in respect to title, and for similar reasons already given should not affect a stranger with presumptive notice. *Farrow* v. *Ross*, 4 Beav. 22 ; 40 Law Library, 153, 154 ; *Carver* v. *Jackson*, 4 Pet. 1, 82—88 ; *Neal* v. *Hugthrop*, 3 Bland. 551—586 ; *McArthur* v. *McMullen*, 2 Barr, 33 ; *Bonner* v. *Wade*, 10 Ohio, 465 ; *Moore* v. *Blackwell*, 6 B. Mon. 67, 73.

Indeed this court has in effect decided this question, in the case of *Kennedy* v. *Northup*, 15 Ill. 149.

In that case, as in this, the patentee had conveyed the lands. His deed was not recorded. Subsequently, a third party who derived title through the deed of the patentee conveyed the land by a deed duly recorded, reciting the conveyance by the patentee. The heirs of the patentee then conveyed, and spread their deed on record. That was, therefore, the precise case now presented. The facts were the same, and the recitals the same. And the court, in deciding the case, treated this reciting deed, thus made by an apparent stranger to the recorded title, not as raising a question of presumptive

notice to the purchaser from the heirs of the patentee, but put the case on the ground as to whether the purchasers of the heirs had actual notice of the prior deed from the patentee, and as to whether they were guilty of actual fraud by reason of such actual notice. This, therefore, brings the case back to the question as to whether Bartlett and Dickenson, at the time they purchased of Crow's heirs, had actual notice of the deed from Crow to Hughes.

We have seen that no actual notice is proved by the witnesses and depositions.

We have further seen that the recording of the deed from Dozier to Conant created no actual or implied legal notice of that deed or of its contents.

The only other way in which actual notice of that deed could be proven, would be to prove that although they were not legally bound to take notice of that deed, they had nevertheless seen and knew the contents of that deed by having read it as recorded. On this point Bartlett's testimony, which is the only evidence on the point, is decisive. He says: "I was informed, before said Dickenson and myself purchased from the Crow heirs, that the name of Conant figured on the records in relation to some deed or paper in relation to the land. I had never examined the record, or the abstract, or index book of deeds on record in the recorder's office. I had seen a paper which I was informed was a copy from the abstract or index book of deeds in the recorder's office, giving the names of the parties to deeds on record, and the book and page in which they were recorded. I supposed this to be a correct abstract or index of deeds, but I had never examined the original abstract or index book, nor the record of deeds."

Again, on cross-examination he repeats the same statement. This as to Bartlett is decisive that Bartlett had never read or seen the recorded deed, and there is no pretense in the evidence that Dickenson had ever done so. He (Bartlett) did see what purported to be a copy of the index of names to deeds, which he supposed to be correct, and which index is spread out on the record, and simply gives the names of grantors and grantees. It shows the deed from Dozier to Conant,

but does not give any deed from Crow, the patentee, under whom Dickenson claims. He relied on that index as showing the patentee had not conveyed, as he had a right to, on the principles both of law and common sense. It was to facilitate the examination of titles that the abstract or index book is required to be kept, and the index book, or the copy of it which he had furnished him, gives no clue as to a further examination for a title or deed from Crow. On this point the case of *Felton* v. *Pitman*, 4 Ga. 530, is a sensible and just view of the law, which was made for practical uses, and in providing for an index book, did not intend to devise a snare for honest purchasers. But it is said if he had read the deed from Dozier to Conant, he would have seen the recital. The answer is, that as a deed from a stranger not connected by the record with the title, he was not bound by the rules of law to read it or know its contents; nor could he have dreamed that it would, if read, give him the information recited in it. Says the case already referred to (*Roberts* v. *Bowen*, 23 Maine, 165) "the record cannot be regarded as giving notice of any facts not to be expected in the ordinary course of business to be found in it;" and such recitals in deeds are under our practice and system of conveyancing almost unknown. We put it to the court, as we might as we believe to every practicing lawyer in the State, to answer, whether in examining titles of record, they ever in any one case, examined a deed not apparently connected with the chain of title for the purpose of seeing whether there was recital of prior conveyance in it. I venture to affirm that the answer would be an universal negative.

IV. The defendant has also established a good defense under the second section of the limitation law of 1839.

On the 7th of December, 1835, Stephen B. Munn conveyed the premises to Charles F. Moulton and Russell H. Nevins as joint tenants, and on the 1st day of March, 1839, they conveyed to Robert Schuyler, Russell H. Nevins, William Couch, Abijah Fisher and Daniel Lee, also as joint tenants. Daniel Lee died in January, and Russell H. Nevins in October or November, 1853, by which the estate in joint tenancy survived to Robert Schuyler, William Couch and Abijah Fisher,

who, on the 20th day of September, 1854, conveyed to William Couch, Abijah Fisher and David H. Nevins; and their grantées conveyed to the defendant Dickenson on the 26th of September, 1856. In the meantime, in April, 1854, Robert Schuyler, William Couch and Abijah Fisher contracted the land by a written agreement to B. F. Scofield, who, on the 1st of June, 1854, assigned the agreement to Bryant Bartlett and the defendant Dickenson, and in June, 1854, Bartlett and Dickenson took possession of the land, which till that time had always remained vacant and unoccupied, and the defendant Dickenson has remained in the possession ever since. On the 1st day of February, 1856, Bartlett conveyed his interest in the premises to Dickenson, who thus by said agreement of sale, and Bartlett's deed, as well as by the deed of the grantees of Couch, Fisher and Nevins, to him, of September 26, 1856, connects himself with the original deed from Munn.

While Robert Schuyler, Russell H. Nevins, William Couch, Abijah Fisher and Daniel Lee, held the Munn title in joint tenancy, they paid the taxes of 1847, on the 4th day of February, 1848, and also the taxes of 1848, 1849, 1850, 1851 and 1852. After the death of Russell H. Nevins and Daniel Lee, in 1853, the survivors in joint tenancy, Schuyler, Couch and Fisher, paid the taxes of 1853 on the 24th of April, 1854. The receipt for the taxes of 1853, was taken in the names of all the joint tenants, of the deceased as well as of the survivors; but as the survivors owned the estate, and those deceased could not pay, it was in law as well as in fact, a payment by the survivors.

Bartlett and Dickenson paid the taxes of 1854 and 1855, and the defendant Dickenson paid the taxes of 1856 and 1857, the last payment being made on the 29th day of January, 1858, being prior to the commencement of this suit, which was on the 7th of March, 1859.

Dickenson has therefore properly connected himself with a sufficient color of title, and the only question is, whether he has shown the payment of taxes under this color of title " for seven successive years," while the land was vacant and unoccupied, within the meaning of the law.

As to the mere matter of fact, there can be no doubt that the language of the law, and the decisions of this court, up to the present time, have been complied with. That the parties making the payments had the legal color of title—that they paid the taxes for " seven successive years," and that at the time of each of these payments, and during the intermediate periods, the land was " vacant and unoccupied."

The taxes were paid for the years 1847, 1848, 1849, 1850, 1851, 1852, and 1853, full " seven successive years." The first year's tax was paid February 4, 1848, and on the seventh year, on the 24th of April, 1854. The land was vacant and unoccupied till June, 1854, when possession of it was taken under the title under which the taxes had been paid. It will be seen, therefore, that although the seven years taxes were paid while the land was vacant, the premises were reduced to possession within less than seven years from the date of the first payment, and the only question, therefore, is whether, after the full payment of the legal series of taxes while the land is vacant, the subsequent taking of the possession of the land by or under the tax payer, before seven years have elapsed from the first payment, defeats and annuls the effect of those prior payments, made strictly in pursuance of the statute; whether the effect of a condition precedent required and sanctioned by law, is, when legally performed, to be overturned by an act subsequent to, and not inconsistent with it.

For the purposes of this case, it might be safely admitted, that the bar of the statute does not attach till the lapse of seven years from the date of the first payment; that Dickenson, if the suit had been instituted before the end of that period, would, though in possession, have been without defense. But that question does not necessarily arise in this case. He was sued long after this period had elapsed, and the sufficient inquiry is, whether, when the payment of the statutory series of taxes is completed while the land is vacant, the subsequent entry on the land, before the seven years from the first payment have elapsed, prevents the bar of the statute from attaching on the expiration of that

period. For this we can only refer to the plain language of the statute, to what seems to be its true construction and manifest object and meaning, and to such authorities as may aid in its correct solution; if, indeed, that which under the language of the statute, would, to a plain man, seem so plain, really needs any solution. This court seems already to have given to the language of the statute, 'its obvious meaning in respect to the acts which constitute the limitation; that though the time when the limitation takes effect, is at the end of seven years from the payment of the first tax, the fact which constitutes the limitation is the payment of taxes for seven successive years, by the holder of the paper title. The payments being completed, the acts required are completed also, and all that remains to create .the bar, is the mere fulfillment of the time. *Newland* v. *Marsh*, 19 Ill. 376, 385 ; *Dunlap* v. *Daugherty*, 20 Ill. 397, 403, 404 ; *Stearns* v. *Gittings*, 23 Ill. 387, 391, 392; *Bride* v. *Watt*, 23 Ill. 507, 510, 512.

GRIMSHAW & WILLIAMS, for Appellee.

We propose briefly to examine the points elaborated by the attorneys of Dickenson, in the order that they are presented on the abstract, and brief of points attached to the abstract.

The description of the land as "N. W. 26, N. 5, W. 8, of the bounty lands," "situate, lying and being in Hancock county, State of Illinois," "patented to Edward Crow, a soldier in the late war," is full and sufficient. But if there was any ambiguity in the deed containing that description, the patent to Crow and conveyances subsequent to the patent and prior to the deed from Dozier to Conant, render the description certain. *Dougherty* v. *Purdy*, 18 Ill. 206.

There is no ambiguity in the description in the deed in this case ; but if there was, the case above cited removes all question as to its admissibility in evidence. See also, *Worden et al.* v. *Williams*, 24 Ill. 74.

The evidence of Conant was introduced as tending to prove notice to Dickenson, through Bartlett, who was his co-grantee

from the heirs of Crow, prior to the pretended purchase of Bartlett and Dickenson from the heirs of Crow.

The letters were wanted only to fix the question of time. They were not written to Breeden, and were not in his possession. The evidence shows that Conant lived out of the State of Illinois, and beyond the reach of a subpœna *duces tecum*. We did all that could be done to get the letters. When we could not get them, we had the right to fix a date by the memory of the witness. We were not seeking to prove contents of letters; but to prove as a fact, that by letter, about a time to be fixed by the memory of the witness, Bartlett had applied to Conant to purchase the land in controversy.

This suit was commenced on the 7th of March, 1859, and has been tried twice before the trial from which this appeal was taken, and this deposition and the affidavit of Breeden were used on those trials. Some objection is made in the argument to the sufficiency of this affidavit, because it was made in February, 1860. How often, we ask, must a plaintiff prepare his case? Was it necessary that Breeden, a resident of Louisville, Ky., where this affidavit was sworn to, should be present at every trial in Hancock, to make a fresh affidavit?

No affidavit was necessary. The letters were never, in contemplation of law, in Breeden's custody, and he only sought to prove a fact and date, and not the contents of the letters. The fact to be proved was notice to Bartlett of a conveyance by the patentee before Bartlett purchased of the heirs of the patentee. The record, we think, apart from Conant's evidence, shows abundant proof to sustain the finding that Bartlett had notice.

It is assigned as error that the court refused to permit witness Scofield to answer a question put to him by appellant.

Dickenson, to make out a defense under limitation act of 1839, had introduced in evidence a bond for a deed from Schuyler and others to Scofield, purporting to be dated in April, 1854, and to have been assigned by Scofield, 1st June, 1854.

The plaintiff below, to rebut that evidence, and, if possible,

to show that the date of assignment of bond was not the true date, called Scofield as a witness, who testified that he had assigned the title bond to Bartlett and Dickenson on the day he got it.

On cross-examination, Dickenson attempted to go into an investigation, through the witness of the opposite party, as to whether when Bartlett and Dickenson got the assignment of the bond through which they claimed the tax title as color of title, they, Bartlett and Dickenson, were claiming from Crow's heirs. The evidence was rejected properly. Dickenson had no right to prove a fact on cross-examination, that had not been asked about on the direct examination.

Again: Dickenson, the defendant below, had rested his case, and plaintiff Breeden had called witness Scofield to prove, by way of rebutting evidence, the date of the transfer of a title bond. What right had Dickenson to use the witness of plaintiff, who had been called to rebut defense of Dickenson, to fortify his defense by a cross-examination of his adversary's witness, called and examined on a different subject? A cross-examination is designed as a test of truth, and must be confined to the subject-matter of the examination in chief. Scofield had not been asked, by the party calling him, about Bartlett and Dickenson claiming title under Crow's heirs.

Dickenson had rested his case on the proof he had introduced, and had no right to attempt to fortify that case by cross-examination of a witness as to a matter not introduced by the direct examination.

The evidence would have been irrelevant even if introduced in proper time.

The merits of the case would not, however, be affected by the decision of the foregoing questions in favor of either party. They do not affect the merits. The finding of the court should have been the same, even if all the foregoing points had been decided in Dickenson's favor; and the verdict of a jury or finding of court should be the same, if, after reversing this case, it goes back for trial on the circuit. See *Greenup* v. *Stoker*, 3 Gilm. 216.

Dickenson sets up two defenses: 1st, Title under the

heirs of Crow, the patentee, recorded prior to date of record of deed from Crow himself, through which Breeden claimed; and 2nd, A defense under 9th section, chapter Conveyance, Rev. Code 1845.

To rebut presumption arising in favor of Dickenson, by reason of his holding under a deed from heirs junior in date to deed of their ancestor, but first of record, Breeden had to litigate a question of fact.

Had Dickenson, of himself, or through his co-grantee, Bartlett, notice of the prior conveyance when he bought of the heirs?

By consent, a jury was waived, and this question of fact was tried by the court. The finding of the court on that question of fact is entitled to the same credit that is given to the verdict of a jury, and will only be disturbed when this court, if case had been tried by a jury, would have reversed a decision of a Circuit Court refusing a new trial, which was moved for on the ground that the verdict was palpably against the weight of evidence.

This court has repeatedly held that the finding of a Circuit Court on questions of fact, was entitled to the same weight as the verdict of a jury.

Breeden proves sufficient to put Dickenson on inquiry.

It is shown by the deed from Dozier to Conant, recorded Sept. 10, 1836, that the land patented to Edward Crow was by that deed conveyed to Elisha L. Conant by Dozier. The evidence of Bartlett, introduced by Dickenson, shows that Bartlett knew, before he purchased, that Conant's name appeared in the record of deeds, and that Bartlett had a copy of the tract or numerical index relating to this land, by which it appeared that the deed from Dozier to Conant was recorded in Hancock county, book B, p. 464, long prior to his purchase from the heirs of Crow.

He being put on inquiry by this sort of notice, and by the positive notice admitted by Dickenson, the defendant, as proved by James A. Winston, starts to purchase title, and as shown by testimony of James I. Dozier, receives from him positive notice that Crow had sold the land before his death.

He further pursues his inquiry and hunts up Conant, and by correspondence gets additional notice. But even if Conant's evidence were rejected, letters and all the testimony of Dozier and Winston, the recorded deed backed by the admission extorted from Bartlett, that he had personal knowledge that the numerical or tract index showed a record of the deed from Dozier to Conant, with its recitals, which, although not correct in all particulars, contained enough to enable Bartlett actually to find both grantor and grantee, was notice most conclusive to him that the title was out of Crow when he bought of Crow's heirs.

Any jury would have been justified, and it would have been its duty to have found that notice was proved both to Bartlett, the co-grantee of Dickenson, which is notice to him, and also to Dickenson, as proved by Winston.

On this question of notice, we refer to *Doyle* v. *Teas,* 4 Scam. 249, 250 ; *Williams* v. *Brown,* 14 Ill. 200 ; *Rupert* v. *Mark,* 15 Ill. 542 ; *Scott* v. *Moore et al.,* 3 Scam. 319 ; *Cox* v. *Wilner,* 23 Ill. 479 ; *Morrison* v. *Kelly,* 22 Ill. 624 ; *Worden et al.* v. *Williams,* 24 Ill. 67 ; *Ogden et al.* v. *Haven et al.,* 24 Ill. 57.

Treating the finding in this case as the verdict of a jury, this court will not disturb the finding, even if in their opinion they might have found the fact of notice differently. *Wendell* v. *Safford,* 12 N. H. 178 ; *Way* v. *Callison,* 6 Leigh, 234 ; *Brugh* v. *Shanks,* 5 Leigh, 599 ; *Dickinson* v. *Parker,* 2 How (Miss.) 219 ; *Lackey* v. *Lane & McCabe,* 7 Miss. 221.

It is the province of a jury to test the credibility of witnesses, so of the court trying the case as a jury. The witnesses are seen, and from their manner of testifying, their credibility may be tested. *Stovall* v. *F. & M. Bank of Memphis,* 8 Smedes & Marshall, 313 ; *England* v. *Burt,* 4 Humph. 401.

The only evidence in any manner contradicting the positive proof of notice, comes from Bryant Bartlett, the man who perpetrated this fraud on the grantees of Crow. His connection with the fraud impeached his credibility, but if this court could have seen his manner of testifying, they would not believe one word he said. Hence we insist on all presumptions

that attach to the finding of the court on the question of notice.

We insist that Dickenson made out no defense under the 9th section of conveyance act of 1845—that he failed to show payment of taxes on vacant land, with color of title and payment of taxes during seven successive years on such vacant and unoccupied land.

The color of title offered is merely a deed from Stephen B. Munn to Moulton and others, dated December 7, 1835. The land was then vacant. Munn had no other pretense of title or possession. We insist that his mere deed for another man's tract of vacant land does not make color (appearance, if you please) of title. If he had been in possession, his deed transferring possession would have been color of title, but out of possession how can a private man's deed to vacant land be color (or appearance) of title. This phrase, "color of title," has been so often argued over that we do not wish again to quote authorities. It was first used in actions of trespass and defenses under twenty-one years or twenty years limitation laws, to characterize the extent of possession of a whole tract as contradistinguished from *pedis possessio* of a portion of a tract, without paper title, or to show that outside of *pedis possessio* there was a possession evidenced by paper claim beyond the actual possession.

The law of 1839 used the expression "color of title" first in a statute; before that time it was a mere construction of a law, by which the phrase "color of title" was interpolated into the statutes or put into the action of trespass. When the act of 1839 used the phrase "color of title" in the second section, now ninth section, of act of 1845, it certainly did not mean to permit a party to make a deed to vacant land, and call that deed "color of title made in good faith to vacant and unoccupied land." This court has never so decided, and it is to be hoped never will.

The "color of title in good faith" should have some better foundation than a mere deed, from one out of possession, to vacant land. This record does not even show that the deed from Munn, the originator of this "color of title in good

faith," was recorded. With equal propriety he might have made " color of title in good faith " to the whole State.

There was, however, an entire failure to show payment of taxes during seven successive years on vacant land. The premises ceased to be vacant and unoccupied in June, 1854. At that time Bartlett and Dickenson took possession. The land ceased to be vacant land. The first taxes were paid on 4th February, 1848, for 1846 and 1847. The last payment while the land was vacant, was on April 24, 1854.

The suit was commenced on 7th March, 1859. All payments made after the receipt of April 24, 1854, were made on occupied land, and would fall under the provisions of the eighth section, conveyance act, of Revised Code of 1845.

This court has drawn a marked distinction between the two sections, in *Dunlap* v. *Daugherty*, 20 Ill. 400, contrasted with *Cofield* v. *Furry*, 19 Ill. 183, and *Darst* v. *Marshall*, 20 Ill. 227.

The first cited case being under the eighth section, the last two cases under the ninth, these cases cannot be reconciled except on the principle that the eighth section applies to cases where possession with claim and color of title forms the bar, and the ninth section, to " color of title made in good faith to vacant land."

The bar must be shown complete under one or the other section, and not by a union of both, and under the ninth section there must be for seven successive years a concurrence of " color of title made in good faith," payment of taxes, and vacant land. *Newland* v. *Marsh*, 19 Ill. 385.

The court says of this section of the statute, when used as a defense : " It does not commence running only from possession taken of the land, but from the time of the concurrence of the two things—color of title and payment of taxes—and has performed its office, when the color of title and payment of taxes have gone together for the period of limitation." " The statute is anomalous, and to give it effect it must be construed consistently with the analogies of limitation laws." Color would not defeat Breeden—payment of taxes, without color, would not defeat him—vacant land would not defeat

him ; but, as the court has interpreted this section, a concur-
rence of vacant land, with color and payment of taxes during
the full period of limitation, seven years, will bar plaintiff's
rights.    See also *Stearns* v. *Gittings*, 23 Ill. 391.

The court says : " The ninth section of this act has substi-
tuted the payment of taxes for possession, to a certain extent,
and under it the payment must be made as the first hostile act
which the owner is required to regard as manifesting an in-
tention to appropriate the property to his use by the holder of
the color of title."

No bar could begin to run in this case until February 4, 1848,
when the first of the series of taxes was paid.  That was the
first act of hostility.  From that time until the month of June,
1854, when the land ceased to be vacant and unoccupied,
only six years and four months elapsed.  But the taxes of
1853 were paid April 24, 1854, six years two months and
twenty days after first payment.

The bar stopped running when the tract ceased to be vacant.
Dickenson having failed to show payment under the ninth sec-
tion, has made no defense treating the land as vacant.  It was
not occupied for seven years before suit, and there is no
pretense of a defense under the eighth section.

For these reasons we insist that judgment below should be
affirmed.

BREESE, J.    Breeden brought his action of ejectment
against Dickenson to recover possession of the north-west
quarter of Section twenty-six, in Township five north, Range
eight west, in Hancock county.  The issue was tried by the
court without a jury, and a verdict and judgment for the
plaintiff, from which the defendant appeals to this court.

Both parties claim title from the same source, the plaintiff
by deed from the original patentee, the defendant by deed exe-
cuted by his heirs-at-law, and he also claims color of title made
in good faith, and payment of taxes for seven successive
years thereunder, as a bar to the plaintiff's right to recover
the possession.  The land was vacant and unoccupied until
the month of June, 1854, at which time the defendant entered

into possession, and was in possession on the seventh of March, 1859, the day of the commencement of this suit.

The principal questions presented by the record, are, did the defendant have notice of the conveyance from the patentee, at the time or before he took a conveyance from the heirs-at-law ? and was the color of title acquired in good faith, and the payment of taxes regularly made, in connection with and under such title, for seven successive years, whilst the land was vacant and unoccupied ?

Objections were made on the trial, to the deed offered in evidence by the plaintiff, from James I. Dozier to E. L. Conant, on account, as is alleged, of the imperfect description of the land. In the deed, it is described as "a certain tract or parcel of land, situate, lying and being in the county of Hancock, in the State of Illinois, containing one hundred and sixty acres, be the same more or less, being north-west 26, north 5, west 8, of the bounty lands, and being the same quarter section patented by the United States to Edward Crow, a soldier in the late war, who deeded the same to the said Dozier." Having to take judicial notice of the acts of Congress, by which the system for the survey of the public lands in this State was organized and established, and of the dedication of a large portion of them for bounties to those who served in the army of the United States in the war of 1812 ; and having to take judicial notice of the subdivision of the State into counties, we can be at no loss in fixing the precise location of the tract in question, by the descriptive words used in this deed. There is no ambiguity or defect in the description, and no other tract of land in this State could suit this description,—it being " bounty land " in Hancock county, but a tract in Township 5 north, Range 8 west of the fourth principal meridian. But if there was an ambiguity of description, it could be explained by proof, and for that purpose resort might be had to the patent to Crow, and to the deeds from him and his grantee. *Dougherty* v. *Purdy*, 18 Ill. 208; *Worden et al.* v. *Williams*, 24 Ill. 74.

Objections were also made to the reading of E. L. Conant's deposition, taken by the plaintiff. No specific objection ap-

pears to have been made to this deposition, but only to its legal effect.

One object of this testimony was to prove notice to the defendant of plaintiff's title, by conveyance from the patentee of the land, or to show that defendant was in a position to put him on inquiry, as to where, and in whom the title really was. The defendant was co-purchaser with Bartlett, from the heirs of Crow, the patentee, and would be affected by such notice as Bartlett might have received ; hence its propriety, as tending to prove notice to him. The letters about which this witness speaks, were his own letters, and not presumed to be in the possession or under the control of the plaintiff, and they were alluded to more for the purpose of fixing the time when notice was obtained, than for any other purpose. Their contents were not sought after, nor were they the groundwork of any portion of the title. It was the simple fact, when was an application made to witness, by Bartlett, to purchase his right to this land. The affidavit of the plaintiff to get at the contents of the letters, was sufficient for that purpose. They were not under his control, nor was the party holding them within the reach of the process of the court. But we deem all this quite immaterial, for it is apparent from other testimony in the cause, that the witness was mistaken about the date of the letters. The letter produced in the record shows the time to have been June 2, instead of April or May, so that Conant's testimony, on this point, amounts to nothing. He was clearly mistaken in fixing the date as in April or May. And it is quite apparent, from the letter itself, that it was the first written by Bartlett to the witness Conant. The whole tenor of the letter shows this, unless it was artfully written for a purpose.

Now, as to the important question in the case. Did defendant have notice of the conveyance of Crow, the patentee, before he purchased the land of the heirs-at-law ?

That purchase was made, and the deed executed, May 13, 1854. The deed from Dozier to Conant, was executed October 8, 1835, and recorded in the proper county, September 10, 1836. That record describes the land as, "the same quar-

ter section patented by the United States to Edward Crow, a soldier in the late war, who deeded the same to the said Dozier."

Was not this sufficient to put a party, honestly seeking to discern the state of the title, upon inquiry? Though no deed appeared of record from Crow to Dozier, still, the fact of one having been executed, is recited in the recorded deed. That it did put Bartlett on inquiry, is abundantly shown. About the 13th of May, 1854, the date of the deed from Crow's heirs to Bartlett and the defendant, Bartlett is at Louisville, Kentucky, and had an interview with Mr. Dozier, who told him all about the title, and how he derived it by deed from Benjamin Hughes, who had a conveyance from Crow, the patentee. Bartlett disputed this title on the strength of some information he pretended to have obtained, of the insanity of Crow at the date of his deed to Hughes, and said to Dozier that he and a Mr. Rankin, and perhaps some other man, were about to buy it of Crow's heirs, through one Johnson, the agent of those heirs, and that he had paid him one hundred dollars on the contract.

On that day, May 13, 1854, after all this information received from Dozier, and after the deed from him to Conant had been on record in the proper county eighteen years, containing in its recitals, substantially the same information, Bartlett took a deed from the heirs of Crow, to himself and the defendant in this action, and transferring his interest to his co-purchaser, that party, the defendant here, undertakes to say that he had no notice of the prior deed from Crow, when he took the deed from his heirs. They lived, it seems, in the same county in which Mr. Dozier resided, and it is a fair inference, that the deed was obtained from the heirs, after this instructive interview with him. If it was obtained before that interview, it can add no strength to the defendant's position, for Dozier told him but little more than the records spoke. Here, then, was actual notice that the title was out of Crow; and the deed from him to Hughes, and from Hughes to Dozier, though last on record, must take precedence of the deed from Crow's heirs, though first on record. The deed

from Dozier to Conant had been on record eighteen years or more, and of which fact Bartlett was fully cognizant when he took the deed from the heirs of Crow.

Now, as to the other branch of the case. Did the defendant show color of title, made in good faith, and payment of taxes concurring therewith, for seven successive years, while the land was vacant and unoccupied, so that the bar of the statute can be interposed? Section 9, Act of 1839, Scates' Comp.

What is color of title made in good faith under that section? For an answer to this question we have only to look to the decisions of this court. In *Woodward* v. *Blanchard*, 16 Ill. 430, it was said that color of title was a question of law, and good faith a question of fact, and that color of title must be a paper title, and whether originating in a wrong or a right, made no difference. There must be some written evidence of title, under the statute, and as the court say, "an act or motion of the mind,"—it must be acquired honestly—it must be such a title as a reasonably intelligent man would have confidence in. Acquiring such a title would be color of title made in good faith.

In *Irving* v. *Brownell*, 15 Ill. 412, this court said, "by the words 'claim and color of title made in good faith,' we must understand such a title as, tested by itself, would appear to be good—that is, a *prima facie* title." We understand by this, that any sort of title a reasonable man would pay money for, and pay the yearly taxes assessed upon it, for a series of years, is color of title made in good faith.

In more recent cases, this subject has been discussed by this court, and in *Dunlap* v. *Daugherty*, 20 Ill. 404, we said, that an executory contract for a conveyance was not color of title. In *Bride* v. *Watt*, 23 Ill. 507, we held, that a certificate of purchase at a tax sale, was not color—that such certificate does not purport to pass any title, either in fee or any other estate. An instrument of writing, to be effectual as color, must purport on its face to convey title. It must, apparently, transfer title to the holder. Not that the title, when traced back to its source, should prove to be an apparently legal and

valid title, but the instrument under which the claimant holds, and upon which he relies, must itself profess to convey a title to the grantor.

In *Holloway et al.* v. *Clark*, 27 Ill. 484, it was held, that the clerk's or sheriff's deed for land sold for taxes, was color of title, and so of a quit claim deed, for they, each of them, purported to convey the title, and it was not necessary, if the deed was regular on its face, to show that the requirements of the statute had been observed in making the sale.

The substance of these decisions is, that any deed purporting on its face to convey title, no matter on what it may be founded, is color of title. So this court said, in the case of *Parker* v. *Watts*, 27 Ill. 224, that a party claiming color of title might avail, in deraigning his title, of a deed wanting a seal. See also, *Dawley* v. *Van Court*, 21 Ill. 460. The object of the ninth section evidently is, to render effective, under certain circumstances, invalid titles, for as to valid titles, this section would be of little practical use. The current of the decisions of this court is, that color of title made in good faith, is shown by any deed or instrument in writing which purports on its face to convey title, which a party is willing to, and does, pay his money for, apart from any fraud, and pays all the public taxes assessed upon the land so conveyed. The deed itself purports good faith, unless facts and circumstances attending its execution, show that the party accepting the deed had no faith or confidence in it. *McConnell* v. *Street*, 17 Ill. 254; *Morrison* v. *Kelly*, 22 Ill. 626. Testing this title from S. B. Munn, through several different purchasers, all of whom are presumed to be intelligent men, and the payment of all taxes assessed upon it for several consecutive years, and there being no proof of fraud, or want of good faith, we think the defendant showed color of title made in good faith to this tract of land. The rule in relation to notice of a title in another party, or notice sufficient to put a purchaser upon inquiry, has no application to a claim of this kind, arising under this statute of limitations. *Woodward* v. *Blanchard*, 16 Ill. 433; *Clapp* v. *Bronaghan*, 9 Cowen, 558.

What papers did defendant exhibit, on this branch of the

case? Seven separate and distinct title papers, all formal, originating in a deed from Stephen B. Munn to Moulton and Nevins, dated as far back as December 7, 1835. What may be the recitals in this deed, we are not informed, but it is easy to conceive it may contain sufficient to satisfy reasonably intelligent and cautious men, that it had some foundation on which to rest. It might recite the fact, that he had purchased the land at a sale for taxes, or some other fact sufficient to inspire some confidence in his act of granting it away. In addition, it is shown, that those who hold this color of title from Munn, paid the taxes assessed upon the land, while it was vacant and unoccupied, for a series of years, and after it was occupied, for four years or more. In the absence of all proof to the contrary, it is vain to say, here was not color of title made in good faith.

The next and only remaining question is, did payment of taxes for seven successive years, concur with this color? Did the payment begin with the acquisition of the color of title, and go on with it, for seven successive years, whilst the land was vacant and unoccupied? This is matter of computation. The first payment of taxes, under color of title, was made on the 4th of February, 1848, for the taxes of 1846 and 1847. In June, 1854, the appellant took possession of the land. The last payment, whilst the land was vacant, was made on the 24th of April, 1854, for the taxes of 1853, a little over six years after the first payment of taxes, so that payment of taxes for seven successive years has not concurred with the color of title, whilst the land was vacant and unoccupied. The payment of the taxes, after possession taken, cannot enter into the account, and thus blend section eight with section nine, of the act. The case must stand wholly on the ninth section, and under that, the appellant did not establish the bar. What was said on this point in *Dawley* v. *Van Court, supra*, is to be considered as dictum merely, and not in the case. On mature reflection, we are satisfied, that to make out the seven years payment of taxes, the two sections cannot be blended, or one lapped on the other.

The judgment is affirmed.      *Judgment affirmed.*